NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 15a0457n.06

No. 13-6651

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
Jun 17, 2015
DEBORAH S. HUNT, Clerk

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff-Appellee, | ) |
| | ) |
| v. | ) ON APPEAL FROM THE UNITED |
| | ) STATES DISTRICT COURT FOR THE |
| KELVIN J. LEWIS, | ) EASTERN DISTRICT OF KENTUCKY |
| | ) |
| Defendant-Appellant. | ) |
| | ) |
| | ) |

BEFORE:    DAUGHTREY, GIBBONS, and GRIFFIN, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge.    Defendant Kelvin Lewis pleaded guilty to conspiring to both distribute oxycodone and commit money-laundering and was sentenced to concurrent prison terms of 192 months. In his plea agreement, he reserved the right to appeal the district court's denial of motions to suppress he had filed. Lewis now asserts: (1) that his arrest was not supported by probable cause; (2) that the warrantless search of information on his cell phones violated his rights under the Fourth Amendment; (3) that the police had no probable cause to conduct a warrantless search of an automobile in which he had been a passenger; (4) that an initial warrantless search of his hotel room was improper; and (5) that the affidavit submitted in support of the application for a warrant to search the hotel room failed to establish probable cause to justify the intrusion on his privacy rights. We find no reversible error and affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

Based upon evidence obtained in controlled drug buys by a confidential informant, Lexington (Kentucky) police officers arrested Jerry Clemons in August 2011, for distribution of oxycodone. Clemons, claiming to be a relatively small-time drug dealer, offered to cooperate with the police and attempt to lure his suppliers into the net set up by the law enforcement officials. With Clemons's permission, the police used Clemons's own cell phone to text his suppliers, Keli Nicholson and Gregory Weisbrodt, and request a new supply of oxycodone pills. Nicholson and Weisbrodt agreed to meet Clemons at his residence, and when they arrived, the police arrested them and confiscated "several hundred oxycodone 30-milligram pills" and "some" 15-milligram pills from Nicholson and Weisbrodt.

Nicholson and Weisbrodt in turn volunteered to cooperate with the police in an effort to snare *their* supplier, defendant Lewis, an individual they described as "a male black subject in his 20s or 30s . . . from the Florida area" and known to them as "Keshon." They indicated that they typically communicated with Lewis through text messages and showed the police some of those communications that had been saved on their phones. Lexington police detective Jared Curtsinger testified at the suppression hearing that:

> [Nicholson and Weisbrodt] had been supplied a large portion of those pills [by Lewis] just within like an hour before [they were] arrested . . . and that they were due to bring back – I can't remember how much it was, I believe it was $2,600 in cash to pay him back for the pills that they had out, and that he would be waiting for that money in return.

Because Lewis would be waiting for Nicholson and Weisbrodt to return to him with the proceeds of the sale of the oxycodone pills Lewis had provided to them, the police confiscated the couple's cell phones but drove with them back to the Best Western motel in Lexington where they were registered as guests. Once Nicholson and Weisbrodt were back in their own motel

room, Curtsinger sent a text message to Lewis from Nicholson's phone saying "that they had the money and were ready to get another . . . large supply of oxycodone pills." Lewis responded with a text message saying, "I'll be there in 15." When Lewis did not arrive within that timeframe, Curtsinger, on behalf of Nicholson, sent a second text message asking Lewis where he was, to which Lewis texted back, "Five minutes."

Nicholson informed Curtsinger that when she received pills from Lewis for the previous sale, "Keshon and another female subject were driving a dark-colored passenger car, possibly a Nissan." Consequently, she suggested that the police should be on the lookout for the approach of such a vehicle to the Best Western motel. According to Curtsinger, he also said that "within the last few weeks one of these transactions . . . occurred where another large male black subject was around during the transactions, as well. And that they thought that there was more people involved in this ring, which is consistent with pill traffickers."

After being told that Lewis was five minutes away, Nicholson, Weisbrodt, and police officers waited in Nicholson and Weisbrodt's motel room for "the next five to ten minutes" until a "gray passenger car arrived and parked right beside Weisbrodt and Nicholson's passenger car, which at that point made them about the only two passenger cars in the parking lot." As Lewis exited from the passenger side of the car and approached Nicholson and Weisbrodt's door, Nicholson confirmed to Detective Curtsinger that Lewis was indeed the individual who had supplied them with oxycodone pills. Thus, when Lewis knocked on the motel room door, the officers opened the door and placed him under arrest. A search of the defendant incident to that arrest yielded an empty prescription pill bottle—a prescription for 140 oxycodone pills that had been written in Lewis's name less than a week earlier. Police also seized from Lewis three or

four cell phones—one of which contained text messages sent by Nicholson—and $1,500 in cash, mostly in $20 bills, but no oxycodone pills.

While Lewis was being arrested and searched inside the Best Western motel room, other officers approached the female driver of the car in which Lewis had arrived and arrested her. During that process, Detective Keith Ford walked to the passenger side of the vehicle and, from his "position outside the vehicle," observed a disassembled cell phone on the passenger-side floorboard, a hotel-room key card, and a deposit slip from an automatic teller machine. Ford gave the key card to Curtsinger, but Curtsinger eventually returned the card to Ford, along with identification information that had been taken from Lewis and from the driver of the gray/black automobile, Lakisha Slaton. Curtsinger then instructed Ford to go to the neighboring Ramada Inn to determine whether Lewis and Slaton had rented a room there and, if so, to secure that room pending the receipt of a warrant to search the premises for evidence of drug distribution.

The desk clerk at the Ramada Inn confirmed that the key card was indeed a key for a room in that hotel and that Lewis and Slaton previously had checked into Room 120 of the establishment. Concerned that another individual working with Lewis and Slaton might be in Room 120 and might destroy crucial evidence because Lewis did not return to the hotel within a designated time period, Ford knocked on the door to Room 120 and "advised that it was the police." Receiving no response, and hearing no sounds emanating from the room, Ford used the key card to gain entry, again announced, "Police," and walked through the room to ensure that no other persons were present. Finding no one else in the room, Ford proceeded back toward the hall door, at which time he noticed a box of plastic sandwich bags on the desk in the room. After transmitting that information to Curtsinger, Ford remained in the room with another officer for at least an hour while Curtsinger secured a warrant to search the room more thoroughly.

Ford claimed that while awaiting the issuance of the warrant, he did not conduct a further search of the room or its contents, did not "open any drawers, look in any luggage, lift up any pillows, or see if anything was laying around." He also denied that, at that time, he put on the blue latex gloves that are used by police during searches so as not to contaminate the crime scene. However, a hotel employee who accompanied his manager to the room 10–20 minutes after the initial arrival of the police, offered that, when the hotel employees checked on the activities of the police, it took Ford and his partner "probably a minute or two" to answer their knock. Furthermore, when the officers finally did open the door, the employee saw a suitcase on the bed and one of the officers with blue latex gloves "in his hands" and "moving around in the room."

In applying for the warrant to search Room 120 of the Ramada Inn, Curtsinger included the information he gathered from Nicholson and from her cell phone, information regarding the arrests of Lewis and Slaton, the fact that Ford had noticed a box of plastic sandwich bags in the hotel room, and the fact that text messages viewed on Lewis's cell phones were "consistent with large-scale oxycodone trafficking." After obtaining the warrant from a Kentucky magistrate, Curtsinger went to the Ramada Inn and conducted a thorough search of Room 120 and of luggage found in the room. The search led to the seizure of 110 oxycodone 15-milligram pills, 79 oxycodone 30-milligram pills, $2,850 in cash, pieces of paper indicating drug trafficking, and bank receipts showing cash deposits in Lexington, Kentucky, and subsequent transfers of the money to individuals in Florida.

In a second superseding indictment, Lewis was charged with conspiracy to distribute oxycodone, possession with intent to distribute oxycodone, and conspiracy to commit money laundering. Lewis then filed multiple motions seeking to suppress evidence obtained as a result

of the searches of his cell phones, the car in which in was a passenger, and the hotel room. Additionally, he asserted that he was arrested without probable cause and that the warrant application was insufficient to justify issuance of authorization to search Room 120. The district court conducted a lengthy evidentiary hearing on the motions and issued two opinions denying Lewis the relief he sought.

In light of those rulings, Lewis chose to plead guilty to the two conspiracy charges in exchange for dismissal of the charge of possession of oxycodone. In that plea agreement, however, Lewis specifically reserved the right to challenge on appeal the denial of his suppression motions. The district court sentenced Lewis to concurrent prison terms of 192 months, and the defendant now exercises his right to appeal the district court's suppression rulings.

## DISCUSSION

## Probable Cause for Arrest

The Fourth Amendment to the United States Constitution "protects the 'right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures.'" *Davis v. United States*, 131 S. Ct. 2419, 2426 (2011) (quoting U.S. Const. amend. IV). Consistent with this bedrock constitutional principle, courts have accepted that a person may not be arrested without probable cause, that is, without "facts that, given the factual and practical considerations of everyday life, could lead a reasonable person to believe that an illegal act has occurred or is about to occur." *United States v. Gill*, 685 F.3d 606, 609 (6th Cir. 2012) (citation omitted). On appeal, Lewis first insists that his arrest was without probable cause. Consequently, he argues that any evidence that was obtained following that arrest must be suppressed.

Specifically, Lewis highlights the facts that the police never observed him engaged in criminal activity and did not recover contraband from him when he was arrested in Keli Nicholson's room at the Best Western motel. He argues further that the sole basis for the finding that probable cause for his arrest existed was the account of his activities given by Nicholson, an account that was not corroborated by the police prior to Lewis's arrest.

"On appeal from the denial of a motion to suppress, we review[] the district court's findings of fact for clear error and its conclusions of law de novo." *Id.* (internal quotation marks and citation omitted). Although it is true that Lewis was not engaged in any observable illegal activity when arrested and that he was not in possession of any controlled substance at the time of his arrest, significant and sufficient corroboration of Nicholson's information regarding Lewis's wrongdoing was obtained prior to effecting Lewis's apprehension.

Perhaps most damning to Lewis's claim of a lack of probable cause to arrest is the fact that Nicholson's cell phone corroborated the supplier-seller relationship between the two individuals. When Nicholson informed Lewis that she had sold the oxycodone pills provided to her and that she was prepared to turn over the proceeds to Lewis and obtain additional pills to sell, Lewis responded by texting that he would meet with her shortly and did, in fact, do so. Moreover, Nicholson informed the police detectives that Lewis would be traveling in a dark-colored passenger car, most likely in the company of an African-American woman. True to that prediction, Curtsinger observed Lewis arrive at Nicholson's motel in a dark-colored passenger car driven by an African-American woman.

A finding of probable cause does not require absolute certainty on the part of the police. Rather, probable cause for an arrest requires only "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Lattner*, 385 F.3d

947, 951 (6th Cir. 2004) (citation omitted). The information obtained by Curtsinger in this case and verified through text messages and personal, visual observation was sufficient to provide the probable cause to arrest Lewis when he arrived at Nicholson's motel room. The defendant's first challenge to the denial of his suppression motions thus is without merit.

## Validity of Warrantless Search of Lewis's Cell Phones

After Lewis was arrested, police confiscated multiple cell phones from the defendant. Without a warrant, Curtsinger accessed data on the phones and noted that one of the devices indicated receipt of a text message from Nicholson. Curtsinger then used that information in his application for a warrant to search Lewis's hotel room, noting that "[a]ll three cell phones contained text messages consistent with large scale Oxycodone trafficking."

Lewis argues persuasively that the recent United States Supreme Court decision in *Riley v. California*, 134 S. Ct. 2473 (2014), found such searches improper and ruled "that a warrant is generally required before [a search of information contained in a cell phone], even when a cell phone is seized incident to arrest." *Id.* at 2493. Recognizing the applicability of *Riley* to this appeal, the government argues that suppression of the recovered information is not required here for various reasons. We need not wade into the morass of exclusionary-rule and good-faith-exception jurisprudence to resolve this issue, however. Any error in accessing the information from Lewis's phones was harmless beyond a reasonable doubt. The knowledge that Lewis's cell phone contained text messages from Nicholson was not necessary to obtain a warrant to search the hotel room. Indeed, the police already had verified through examination of *Nicholson's* cell phone that Lewis was aware of the oxycodone-distribution operation, that the defendant was contacted by Nicholson when she needed additional oxycodone, and that Lewis responded to that request with an indication of his intention to re-supply his downstream seller. Furthermore, the

gratuitous comment in the warrant application that the search of the defendant's cell phones uncovered text messages consistent with large-scale distribution of controlled substances also was cumulative to other information in the affidavit. In short, as indicated below, there was more than enough evidence in the affidavit to establish probable cause even without the evidence from the cell phones. The constitutional violation committed by searching the information contained in Lewis's cell phones thus constituted harmless error beyond a reasonable doubt.

**Warrantless Search of the Vehicle in Which Lewis Was a Passenger**

Lewis also contends that the police improperly searched the vehicle in which he arrived at the Best Western motel. According to the defendant, the police lacked probable cause to believe that the automobile contained contraband and, as a result, were forbidden from searching the car without authorization from a neutral and detached magistrate.

"Under the automobile exception to the warrant requirement, an officer may search a readily mobile vehicle without a warrant if he has probable cause to believe that the vehicle contains evidence of a crime." *United States v. Johnson*, 707 F.3d 655, 658 (6th Cir.) (internal alterations, quotation marks, and citations omitted), *cert. denied*, 134 S. Ct. 296 (2013). There can be no dispute that the automobile in which Lewis arrived at Nicholson's motel was "readily mobile." Moreover, the police had probable cause to believe the car contained evidence of the crime of oxycodone distribution. Nicholson had earlier texted Lewis and requested that he supply her with 200 additional oxycodone pills. Lewis agreed to do so, traveled to meet Nicholson at her motel, and arrived there within the general time frame agreed upon in the text-message exchange. When Lewis was arrested, a search of his person did not uncover the pills that were to be delivered. Police did confiscate from him, however, a prescription pill bottle that, no more than one week earlier, had contained 140 oxycodone pills. In light of those discoveries,

the police clearly had probable cause to believe that the pills that Lewis was supposed to transport to Nicholson could be in the vehicle in which he arrived. The district court thus did not err in denying Lewis's motion to suppress the evidence gathered from the search of the rental automobile in which Lewis had been a passenger.

**Warrantless Search of Hotel Room**

Lewis also challenges the constitutionality of the entry into his hotel room by Detective Ford prior to the issuance of a search warrant for that room by a state magistrate. Because no information or evidence obtained by Ford during his warrantless entry into the room was crucial to the issuance of the subsequent warrant, this issue also is without merit.

Without question, "a hotel room may be the object of Fourth Amendment protection as much as a home or an office." *United States v. Lanier*, 636 F.3d 228, 231 (6th Cir. 2011) (internal quotation marks and citations omitted). Even though the district court assumed that no exigent circumstances justified the pre-warrant intrusion into Room 120, the government maintains that Ford was authorized to perform a "protective sweep" of the room in order to ensure that no other individuals were there and to ensure that no evidence was destroyed prior to the arrival of a valid search warrant at the location.

The government argues that Ford was entitled to conduct a "protective sweep" of the hotel room. *See United States v. Biggs*, 70 F.3d 913, 915 (6th Cir. 1995). It is not necessary to decide whether there was justification for a sweep because, even if there was not, no grounds for suppression of the evidence subsequently found in Room 120 exist. Evidence obtained improperly and without a warrant still may be admitted at trial "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." *Nix v. Williams*, 467 U.S. 431, 444 (1984). *See also United*

*States v. Pritchett*, 749 F.3d 417, 437 (6th Cir.), *cert. denied sub nom. Johnson v. United States*, 135 S. Ct. 196 (2014). In this case, Ford entered the room ostensibly to protect its contents pending the issuance and arrival of a judicially sanctioned search warrant. Even had Ford discovered the hidden drugs and other evidence of trafficking prior to issuance of the search warrant—a premature discovery for which there is no evidence whatever[1]—it cannot be disputed seriously that the same incriminating evidence would have been found after the warrant was issued and a full-scale search of Room 120 conducted.

Lewis nevertheless argues that even if the incriminating evidence would have been discovered upon the execution of a sanctioned search, the conduct allegedly undertaken by Ford should be deterred by suppression of any contraband subsequently found in the room. Again, however, the appellate record contains no indication that any act committed by Ford was truly prejudicial. Even viewing the evidence in the light most favorable to Lewis—a step this court is not required to take—all that the defendant could have established is that Ford entered Room 120 prior to delivery of the search warrant, Ford placed one of Lewis's bags on the room's bed, and Ford pulled on blue latex gloves. In light of subsequent occurrences, none of those factors, either separately or in conjunction with one another, justifies the remedy that Lewis seeks on appeal.

Nor can Lewis seek to justify suppression of subsequently discovered evidence on the ground that Ford's allegedly illegal entry into Room 120 resulted in the transmission of information crucial to the application for the warrant. It is true that Detective Curtsinger included in his affidavit in support of the warrant application the following statements:

---

[1] Lewis attempts to draw adverse inferences from the fact that a Ramada employee saw one of Lewis's suitcases on the bed in Room 120 and observed Ford in that room clad in blue latex gloves prior to the arrival of Curtsinger and the search warrant. Even if that testimony were accredited and Ford's denials of the same rejected, no evidence before the district court or this court indicates that the suitcase in which the drugs were found was opened prior to the issuance and execution of the search warrant.

> While securing the room Detective Ford observed in plain view an open box of sandwich bags on the table. The affiant knows from his training and experience that these bags are often used to package illegal narcotics for distribution. The affiant also was advised by Nicholson that Lewis usually packages his pills in a plastic sandwich bag.

However, the affidavit recounted Nicholson's history with Lewis, Nicholson's text-message exchange with the defendant, Lewis's response to her request for additional pills to sell, his appearance at her motel room door, the fact that he then was in possession of an empty pill bottle for a 140-count prescription that was less than one week old, the fact that Lewis had no other pills on his person despite his promise to re-supply Nicholson, and the fact "that narcotic traffickers will sell narcotics from a hotel room to avoid detection." Even excluding the reference to the sandwich bags (and the reference to the search of Lewis's cell phones), there was more than sufficient evidence from which the magistrate could have concluded there was probable cause.

In short, Lewis can point to no prejudice he suffered that flowed directly and singularly from Ford's warrantless entry into his hotel room. The defendant's contention that all incriminating evidence against him should be suppressed in light of that entry thus is without merit.

**Sufficiency of Application for Issuance of Search Warrant**

In his final appellate challenge, Lewis alleges that Curtsinger's application for a search warrant was insufficient to establish the probable cause necessary to obtain that authorization. Specifically, he insists that the application was defective because: (1) it did not contain a transcript of the text messages sent between Nicholson and Lewis; (2) it did not describe Curtsinger's training and experience that justified his suppositions in support of the warrant request; (3) it did not establish with sufficient particularity Nicholson's reliability as an

informant; (4) it did not establish a nexus between the hotel room and any illegal activity; and (5) after excising the information recovered from Lewis's cell phones and from the allegedly illegal entry into the hotel room, there was no reason to believe that the defendant was guilty of a crime or that evidence of that crime could be found in his hotel room.

An affidavit is considered sufficient if it establishes probable cause to believe that evidence of the narcotics trafficking would be found in the place to be searched. *Lattner*, 385 F.3d at 951. A showing of probable cause does not necessitate establishment of absolute proof of a location's connection with illegal activity; rather, probable cause "is said to exist 'when there is a "fair probability," given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place.'" *Id.* (quoting *United States v. Davidson*, 936 F.2d 856, 859 (6th Cir. 1991), and citing *United States v. Johnson*, 351 F.3d 254, 258 (6th Cir. 2003)). We must accord great deference to an issuing judge's finding of probable cause and may reverse that determination only if there is no "substantial basis" for it. *United States v. Miller*, 314 F.3d 265, 268-69 (6th Cir. 2002) (quoting *Illinois v. Gates*, 462 U.S. 213, 236 (1983)). Not only has the government established the necessary "substantial basis" for the finding of probable cause in this case, but each of Lewis's attacks on that determination is without basis.

First, there is no requirement that the application for a warrant contain a verbatim transcript of cell phone conversations mentioned in the affidavit. Here, Curtsinger sufficiently described the gist of the messages between Nicholson and Lewis:

> Once at the room Keli Nicholson placed a text message to "Keshawn" advising that she had the money and wanted two hundred more pills. "Keshawn" replied back that he was good for the two hundred pills and that he would be over in the next fifteen minutes. Approximately twenty minutes later Nicholson sent another text message to "Keshawn" who advised that he was five minutes away.

Nor is there any merit to the defendant's claims that the affidavit did not provide information about Curtsinger's training and experience or establish Nicholson's reliability as an informant. The affidavit mentioned that Curtsinger had been a police officer for nine years, clearly a sufficiently lengthy period of time to gain expertise in the investigation of drug offenses. Moreover, this court has held that "named informants, unlike confidential informants, require little corroboration." *United States v. Williams*, 544 F.3d 683, 690 (6th Cir. 2008) (citation omitted). Even so, Nicholson's information was corroborated sufficiently. She accurately described the vehicle in which Lewis would be traveling and correctly indicated that Lewis would be in the company of an African-American female. Furthermore, her text messages to Lewis produced the expected result of having Lewis visit Nicholson at her motel room.

Finally, even ignoring any reference to information obtained from Lewis's own cell phones or information related by Detective Ford to Curtsinger after Ford's initial entry into the defendant's hotel room, the affidavit was more than sufficient to establish not only probable cause to believe that Lewis was involved in drug-trafficking, but also probable cause to believe that Room 120 at the Ramada Inn was connected with that illegal activity. Indeed, as the district court exhaustively detailed, the warrant application stated that:

> 1) Clemons had admitted selling oxycodone and had agreed to a controlled buy with Nicholson and Weisbrodt; 2) Nicholson and Weisbrodt arrived at Clemons' residence with over 100 oxycodone pills and that they admitted to selling them; 3) Nicholson and Weisbrodt informed the officers that their supplier was "Keshon," that he was staying at the Ramada Inn, that they were supposed to bring him back $2,600 in cash when they sold the pills and that they were supposed to place another order from him after they paid him the money; 4) Nicholson and Weisbrodt informed the officers that Keshon was a black male in his 30s from Florida and that he was driving a black Nissan passenger car accompanied by his girlfriend; 5) when the officers went to the Best Western with Nicholson and Weisbrodt, Nicholson texted Keshon advising him that she had the money and wanted 200 more pills and that he replied back that he would be there in 15 minutes and later sent a text saying it would be 5 more minutes; 6) within the time frame set forth in Nicholson's texts, the officers observed a black Nissan

passenger car arrive in the parking lot and park next to Nicholson's car; 7) a person that Nicholson identified as Keshon and that matched her description of Keshon emerged from the car and knocked on Nicholson's hotel room door; 8) after arresting Keshon, the officers found on him an empty Oxycodone prescription bottle for 140 pills issued five days before the search; $1,500 in cash; and three cell phones; 9) the officers retrieved from the car a hotel room key and a receipt from a PNC bank account showing a deposit on that day of $4,600 in cash; 10) that Detective Ford took Lewis's identification and the room key to the Ramada Inn and that the manager advised that Lewis was staying in Room 120 and that the room key was for Room 120.

Thus, Lewis's challenge to the sufficiency of the warrant application also is without merit.

## CONCLUSION

For the reasons set out above, we AFFIRM the judgment of district court.